Desselles-LK v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-232-CR

        LARRY KYLE DESSELLES,
                                                                                       Appellant
        v.

        THE STATE OF TEXAS,
                                                                                       Appellee
 

From the 52nd District Court
Coryell County, Texas
Trial Court # 13,477
                                                                                                    

O P I N I O N
                                                                                                    

          A jury convicted the appellant, Larry Kyle Desselles, of the aggravated sexual assault of
a child and assessed punishment at sixty years' incarceration in the Texas Department of Criminal
Justice-Institutional Division. Tex. Penal Code Ann. § 22.021 (Vernon 1994 & Supp. 1997). 
Desselles raises three points of error on appeal: (1) the trial court erred in allowing into evidence
a photograph the authenticity of which was not properly established; (2) the trial court erred in
allowing medical documents into evidence that were not properly authenticated; and (3) the
evidence was factually insufficient to support the judgment. We affirm.
I. Factual Background
          The record reveals that on January 5, 1994, Desselles penetrated his four-year-old niece's
vagina with his finger. Shannah Schaefer, who is Desselles' sister and the victim's mother,
learned of the assault on the evening of the offense while trying to bathe the child. When Schaefer
put her in the water, the child started to cry and complained that she was hurting. Schaefer then
looked the child over and noticed that her vaginal area was "real red."
          Schaefer immediately suspected that Desselles had sexually assaulted the girl. Fearing,
however, that he would leave the premises if he learned that she was going to take the child to be
examined, Schaefer waited until the next day to see a doctor. On January 6, Schaefer took the
child to the emergency room at Darnell Army Community Hospital at Fort Hood. Jamie Winter
Walraven, M.D., after conducting a brief preliminary check of the child's eyes, ears, nose and
throat, attempted to conduct a genital exam. The child, however, strongly resisted Dr. Walraven's
attempts to examine her genital region. Dr. Walraven then referred the child to a pediatrician at
the hospital who, similarly, was unable to conduct a genital exam. Either this pediatrician or
another pediatrician then decided to schedule the child to have a full genital exam the next day
under sedation.
          The following day, Dr. Arif Mahood examined the child, who had been sedated for the
purpose of the examination, and discovered that her "hymen was absent" and that her "labia
majora and minora were erythematous," meaning that the skin around her vagina was unusually
red. At some point in time, the matter was referred to Child Protective Services for consideration. 
An investigation was undertaken by CPS employee Loretta Ferguson, and she determined that the
child's actions were consistent with the actions a typical child of her age would have in truthfully
relating that he or she had been assaulted.
          The criminal investigation in the case began on January 6 when Schaefer reported the
incident to the Coryell County Sheriff's Department.
II. Authentication of the Hospital Records
          In his second point of error Desselles argues that the trial court erred in admitting into
evidence State's exhibits two and three, which consist of documentation of the medical
examinations the victim received at Darnell. The record reflects that the State offered the
testimony of Sergeant Donna Greene to authenticate these two exhibits. Sergeant Greene attested
that she is the medical records' custodian for Darnell. She testified, however, that she did not
create the documents comprising State's exhibits two and three and that she is not the head of the
personnel department at Darnell. Desselles argues from these statements that Sergeant Greene
could not be the custodian of records as contemplated by Tex. R. Crim. Evid. 803(6).
          It is of no moment that Sergeant Greene neither created the documents nor that she is not
the head of the personnel department at Darnell. To authenticate a record of a regularly conducted
activity, such as documentation relating to a patient's examination at a hospital, Rule 803(6) does
not require that the person authenticating the record be either the creator of the record or to have
personal knowledge of the information recorded therein. Brooks v. State, 901 S.W.2d 742, 746
(Tex. App.—Fort Worth 1995, pet. ref'd, pet. dism'd). The witness need only to have knowledge
of how the records were prepared. Id.
          Sergeant Greene testified that she keeps all the medical records at Darnell Hospital and that
the documents comprising State's exhibits two and three were made in the normal course of
business at about the same time as the examination. This testimony was sufficient to meet the
authentication requirements under Rule 803(6). Desselles' second point is overruled.
III. Authentication of the Photograph
          In his first point Desselles complains that the trial court erred in allowing into evidence an
allegedly unauthenticated photograph of the victim. See Tex. R. Crim. Evid. 901. Desselles'
complaint, however, was not properly preserved for our review. See Tex. R. App. P. 52(a). To
preserve error for review, a specific objection must be made each time an offer of inadmissible
evidence is made. Ethington v. State, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). Moreover,
"[a]n objection to photographic evidence is waived if the same information contained in the
photograph[] is conveyed to the jury in some other form." Havard v. State, 800 S.W.2d 195, 205
(Tex. Crim. App. 1989). The complained-of photograph allegedly shows the victim lying on her
back on the date she was examined by Dr. Mahood in a "frog-legged position" with her legs
spread so that a picture of her vagina could be taken to show the swollen and erythematic condition
of the skin around it.


 Schaefer testified that when she learned of the child's injuries she asked
a friend, Lesa Goodwin, who was staying in her home at the time with her three children, also to
look at the child's vaginal area. At trial, Goodwin testified without objection that the condition
of the vagina pictured in the photograph was essentially the same as the child's vagina on the night
she saw the child, although the redness and swelling were not as severe. Moreover, as indicated
above, Dr. Mahood stated in his report that the skin around the child's vagina was erythematic
when he examined her on January 7. Desselles offered no objection to Dr. Mahood's report that
the information contained therein was the same or duplicative of the information represented in
the photograph. By failing to offer such an objection to either Goodwin's testimony or Dr.
Mahood's report, Desselles waived his complaint against the photograph. Finding his complaint
waived, we overrule his point of error. 
IV. Factual Sufficiency
          In his third and final point Desselles argues that the evidence is factually insufficient to
support the judgment. He contends that the evidence presented to convict him was entirely
circumstantial and that the State failed to present factually sufficient evidence to exclude every
reasonable hypothesis but his guilt. He asserts that evidence was admitted that the victim had a
habit of inserting toys and other objects into her vagina and that the victim had on three other
occasions prior to this offense alleged that two other people and Desselles had sexually assaulted
her. Desselles maintains that this evidence could reasonably explain the redness of the skin around
her vagina and explain why the child charged that Desselles had sexually molested her.


 We will
at the outset review the present viability of the "outstanding reasonable hypothesis" construct both
at the trial court and appellate levels.
A. Outstanding Reasonable Hypothesis as a Standard to Review
the Factual Sufficiency of the Evidence on Appeal
          The "outstanding reasonable hypothesis" construct at the trial court level is dead in Texas. 
See Brown v. State, 911 S.W.2d 744, 745-46 (Tex. Crim. App. 1995). Prior to the Court of
Criminal Appeals' decision in Hankins v. State, 646 S.W.2d 191 (Tex. Crim. App. 1983) (on
rehearing), the reliability of circumstantial evidence was considered to be more suspect than direct
evidence; accordingly, juries in circumstantial evidence cases were required to exclude every
reasonable hypothesis but the defendant's guilt in order to convict. See Brown, 911 S.W.2d at
745; Hankins, 646 S.W.2d at 197-98. The Hankins court, following a similar holding under
federal law by the United States Supreme Court in Holland v. United States, 348 U.S. 121, 137-39, 75 S.Ct. 127, 136-37 (1954), held that circumstantial evidence can be just as strong and
probative as direct evidence and, therefore, rejected the "outstanding reasonable hypothesis"
construct as a standard of proof that the juries should consider in circumstantial evidence cases. 
Hankins, 646 S.W.2d at 199.


 The court considered that circumstantial evidence frequently is
more probative than direct evidence and that, under Texas law, jurors are not required to give
more credence to direct evidence than circumstantial. Id. at 198; see Brown, 911 S.W.2d at 745-46. Therefore, reasoned the court, "a jury instruction to treat [circumstantial] evidence differently
[than direct evidence] is not . . . necessary to protect any rights of the defendant or to accomplish
any other important objectives of the [criminal justice] system." Brown, 911 S.W.2d at 746; see
Hankins, 646 S.W.2d at 199. With juries then required to treat circumstantial evidence in the
same manner that they treat direct evidence, the "outstanding reasonable hypothesis" charge was
rendered obsolete.
          Eight years later, the Court of Criminal Appeals in Geesa v. State, 820 S.W.2d 154, 159
(Tex. Crim. App. 1991), likewise discarded the "outstanding reasonable hypothesis" construct as
an appellate standard to review the legal sufficiency of the evidence.


 The Geesa court considered
that the use of the reasonable hypothesis standard on appeal was inextricably linked to the
"outstanding reasonable hypothesis" jury charges that were given prior to Hankins. Id. at 159. 
The court reasoned that, once the "outstanding reasonable hypothesis" instruction was no longer
required in Texas, the very purpose for the "outstanding reasonable hypothesis" analytical
construct, either at the trial court or on appeal, no longer existed. Id. 
          We are aware that both Brown and Geesa were decided prior to the Court of Criminal
Appeals' opinion in Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996), which recognized
the authority of the intermediate courts to conduct factual sufficiency reviews in criminal cases. 
Accordingly, Brown and Geesa were looking at the sufficiency of the evidence only from the legal
sufficiency standpoint under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979), and not
with regard to an appellate court's duty to review the factual sufficiency of the evidence. But this
is a distinction without a difference. Brown and Geesa jettisoned the "outstanding reasonable
hypothesis" as an appellate standard, not because the reviewing court in legal sufficiency cases
must view the evidence through the Jackson prism, but because circumstantial evidence was
considered to stand on an equal plane with direct evidence. Brown, 911 S.W.2d at 746; Geesa,
820 S.W.2d at 159. There is no doubt that the Court of Criminal Appeals had, prior to Geesa,
claimed that the "outstanding reasonable hypothesis" standard was a method of applying the
Jackson standard in Texas, see Butler v. State, 769 S.W.2d 234, 238 n.1 (Tex. Crim. App. 1989)
(quoting Carlsen v. State, 654 S.W.2d 444, 449 (Tex. Crim. App. 1983) (on rehearing)), but this
rationale was expressly disavowed in Geesa. 820 S.W.2d at 159; see Brown, 911 S.W.2d at 746. 
The Geesa court explained that the "outstanding reasonable hypothesis" standard required a higher
level of proof than is required by "proof beyond a reasonable doubt." Geesa, 820 S.W.2d at 159
(citing Griffin v. State, 614 S.W.2d 155, 159 n.5 (Tex. Crim. App. [Panel Op.] 1981)). 
Therefore, by requiring the State to meet the "outstanding reasonable hypothesis" standard on
appeal when the jury was required only to find proof beyond a reasonable doubt to convict at trial,
the "outstanding reasonable hypothesis" standard "misappropriate[d]" to the courts of appeal the
jury's authority to weigh the evidence. Geesa, 820 S.W.2d at 159; see Brown, 911 S.W.2d at
746.
          While, under a factual sufficiency review, the court on appeal does not give such enormous
deference to the trier of fact's assessment of the evidence, due deference must still be provided the
jury's resolution of conflicts in the testimony and questions of the witnesses' credibility. Clewis,
922 S.W.2d at 133; Davila v. State, 8-94-371-CR, slip op. at 7 (Tex. App.—El Paso, July 3,
1996, no pet. h.). The intermediate courts' new-found authority to conduct factual sufficiency
reviews does not allow us to sit as the "thirteenth juror" in the case. See Geesa, 820 S.W.2d at
159. There is no logical reason for an appellate court, in performing a review of the factual
sufficiency of the evidence, to examine the evidence in light of a higher burden of proof than the
trier of fact applied at trial.


 Yet, this is exactly what would be achieved by an application of the
"outstanding reasonable hypothesis" standard in factual sufficiency cases. The reasoning of the
Court of Criminal Appeals in abandoning the "outstanding reasonable hypothesis" standard on
appeal applies to both legal and factual sufficiency cases. In conclusion, we hold that there is no
need to resurrect the extinct "outstanding reasonable hypothesis" standard.



          Therefore, as the Court of Criminal Appeals held in Clewis, in conducting a factual review
of the evidence, we will reverse and remand for a new trial if, after the viewing all of the evidence
in the case, both in favor of and opposed to the verdict, the judgment is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Clewis, 922 S.W.2d at
129 (quoting Stone v. State, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd, untimely
filed)). The reviewing court may reverse either because the verdict is based on weak or
insufficient evidence or because the proponent's proof, although adequate if taken alone, is
overwhelmed by the opponent's contrary proof. See William Powers, Jr. & Jack Ratliff, Another
Look at "No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515, 519 n.11 (1991). 
Furthermore, as the reason for the Geesa court's abandonment of the "outstanding reasonable
hypothesis" standard was because it imposed a higher burden of proof on appeal than at trial, see
Brown, 911 S.W.2d at 746, we must be mindful of the level of proof required at trial when
conducting a factual sufficiency review of the elements of the offense. The court in Clewis, in
enunciating the factual review standard, revealed that it believed the standard "harmonize[d] the
criminal and civil jurisprudence of [Texas] with regard to appellate review of questions of factual
sufficiency." 922 S.W.2d at 129. In Hankins, the court pronounced that in all criminal cases,
circumstantial, direct or a combination thereof, "the jury [in determining the verdict] should
consider the totality of the direct or circumstantial evidence and the reasonable inferences which
may be drawn therefrom, in determining whether it was sufficient to establish guilt beyond a
reasonable doubt." 646 S.W.2d at 199. This standard in Hankins takes into account who has the
burden of proof, what that level of proof is, and the evidence that should be considered in making
that determination. See Clewis, 922 S.W.2d at 129. Therefore, in accounting for the State's
burden and level of proof at trial, we will take these same factors into consideration in conducting
our review of the factual sufficiency of the evidence. See Geesa, 820 S.W.2d at 159 ("[T]he
sufficiency of the evidence must be measured against the jury charge.").
B. Factual Sufficiency Review in the Instant Case
          Desselles contends that the evidence establishes only that the victim somehow lost her
hymen prior to Dr. Mahood's examination, not that she was ever sexually assaulted by Desselles. 
In support of his contention, he refers to evidence that the victim had, prior to the offense, inserted
toys into her vagina, which would explain the loss of her hymen, and that she had prior to the
offense made accusations of sexual molestation against three different people, which would explain
why she accused Desselles of sexually assaulting her.
          Schaefer testified that when she examined the victim's vagina on the night of the offense
it was "real red," and this fact was confirmed in the report Dr. Mahood made following his
examination two days after the offense. Further, Schaefer testified that when she placed the child
in her bath water on the night of the offense the child cried and complained that she hurt. The
child continued to be upset over the condition of her vaginal area on each of the following two
days when she vehemently objected to the efforts of medical personnel to examine her. She
protested so stringently that the medical personnel were only able to conduct their examination by
sedating her. The child had not protested in the past when she had to take off her pants, although
not her underwear, to have a wart removed from her upper, inner thigh by a medical doctor.
          On the first of the child's two visits to Darnell Hospital, the child told Schaefer that
Desselles had hurt her by putting his fingers in her vagina. Goodwin, who was present at the first
medical examination, affirmed that the child claimed that Desselles had hurt her.
          Schaefer testified that the child's behavior changed dramatically after January 5. She began
to have nightmares, threw "bad tantrums," would say to people, "I'm going to kill you, or you're
going to die if I . . . tell you anything," started to tell people that she had a secret that she could
not tell them, and would "act[] like a little baby" whenever the subject of the assault was brought
up.
          Dr. Walraven testified that it would be unusual for a female child not to have an intact
hymen until engaging in sexual intercourse. She stated that it is possible for a child's hymen to
be perforated prior to engaging in sexual intercourse as a result of certain kinds of accidents,
particularly accidents which cause a sharp object to enter the child's vagina. Dr. Walraven further
explained, however, that in most accident situations, the hymen is only perforated and not
completely removed. The hymen of the victim in the instant case was no longer present at all. 
On cross-examination, Dr. Walraven testified that there was no evidence of bleeding and that one
would expect to find evidence of bleeding if the hymen had been removed within the past twelve
hours. On re-direct Dr. Walraven related that the alleged assault actually occurred more than
forty-eight hours prior to the examination. Desselles did not ask any questions on re-cross.
          The defense opened its case by calling Flora Lachney to the witness stand. Lachney is
Desselles' grandmother and the victim's great-grandmother. Lachney testified that she had in the
past bathed the child and that when doing so found the child inserting toys into her vagina. 
Lachney told Schaefer about the child's actions, but Schaefer refused to believe that the allegations
were true. On cross-examination, Lachney testified that when she had been giving the child baths,
the child was staying at her house in Marksville, Louisiana. Across the street from Lachney lived
Lachney's daughter (Desselles' mother) and Desselles. Lachney testified that the child and
Desselles interacted with each other during that time.
          The defense's next witness was Desselles' mother, Betty Desselles. Betty testified that for
the past five or six years Desselles had lived with her and a man named Leonard Datsat in
Marksville, Louisiana, across the street from Lachney. She stated further that for about six or
seven months, from May or June 1992 until January 1993, the victim lived in her house, but also
during this time both Desselles and Schaefer lived in Covington, Louisiana. In June or July 1993
Schaefer moved to Coryell County, Texas. Schaefer did not immediately take the child with her
to Coryell County; instead, she allowed her to remain at Betty's house during the latter part of
1993, and Desselles lived in the same household during this time. Desselles, however, never
bathed the child at this or any other time. Betty testified that, while the child was staying with
her, she found her inserting toys into her vagina while taking baths and found her pretending to
have sexual intercourse with her stuffed animals. Betty reported the incidents to Schaefer, who
again denied the truth of the allegations. Betty suggested to Schaefer that the victim was feigning
sexual intercourse with her stuffed animals and inserting toys into her vagina because Schaefer had
allowed the child to watch her perform sexual acts. When later questioned by the police about the
charges against Desselles, Betty commented that, on one of the occasions when she saw the child
inserting toys into her vagina, the child explained that Desselles had shown her how to do that. 
Betty stated that the child had accused three different persons of sexually assaulting her: Datsat,
Desselles, and one of Betty's cousins named Barbara. Betty said that Barbara could not have
assaulted the child because at the time of the complaint Barbara had not been at Betty's home in
a long time, and she said that Desselles could not have assaulted the child because Desselles was
living in Covington at the time of the complaint.
          Desselles testified during guilt-innocence and denied that he sexually assaulted the child. 
He admitted that he served twenty-one months in a Louisiana prison on two charges of attempted
aggravated arson, one for trying to burn a car and another for trying to burn a school. He further
stated that on the night of the offense the victim accused her six-year old brother of putting his
finger in her vagina. He admitted on the date of the offense that he was alone with the victim and
that he had been alone on occasion with the child when both of them were living in Marksville,
Louisiana.
          The State also called Ferguson, the CPS investigator, to the witness stand. She stated that,
while interviewing the victim, the victim identified Desselles as the person who had assaulted her. 
Ferguson further indicated that the victim, during their conversations, exhibited the symptoms of
a child who was being truthful in her contention that she had been abused. Some of the factors
an investigator with CPS considers in determining the veracity of a child's allegation of assault,
stated Ferguson, are how the child reacts when questioned about the abuse and how the child
answers questions about the allegation. When asked by Ferguson about her allegation against
Desselles, the child became frightened and stated, in response to a question, that she was telling
the truth. Upon completing her investigation, Ferguson recommended to Schaefer that the victim
receive counseling.
          Considering all the evidence in the record, both for and against the verdict, we conclude
that the judgment is factually supported by the record. Schaefer noticed that on the date of the
offense, the skin surrounding the victim's vagina was "real red," and this fact was confirmed by
Goodwin and Dr. Mahood's report. Schaefer also testified that after the assault the victim's
manner and mood changed severely. Shaefer's testimony was confirmed by Goodwin's testimony
that the victim on the night of offense was upset and crying and Dr. Walraven's testimony that the
child resisted so strenuously to her efforts to conduct a genital exam on the day after the offense
that a second exam had to be scheduled for the following day when the child could be sedated. 
Ferguson, a child abuse investigator with several years of experience, testified that the child
exhibited the mannerisms that a child who had been abused would typically exhibit in truthfully
stating that he or she had been abused.
          Desselles did deny that he sexually assaulted the victim, and there was evidence that the
victim may have lost her hymen by inserting toys into her vagina. This fact was supported by Dr.
Walraven's testimony that there should have been evidence of bleeding if the child had lost her
hymen within the past twelve hours. But, to counteract this contention, there was evidence that
such evidence would not necessarily be found in this case where the child was examined more than
forty-eight hours after the assault and that Desselles may have molested the victim several months
earlier when they were both living either in the same house or across the street from each other
in Marksville, Louisiana. Moreover, even if Desselles' contention is correct that the child lost her
hymen by inserting toys into her vagina, such proof does not eviscerate the affirmative evidence
adduced that the victim had been sexually assaulted by Desselles on January 5, 1994.
          Upon considering all the evidence, we conclude the verdict was not so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. See Clewis, 922 S.W.2d
at 129. Desselles' third point of error is overruled.
          The judgment is affirmed.

                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Davis,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed November 20, 1996
Publish